**THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DEBORAH METZ | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. 10-383 |
| v. | ) |
| | ) Judge Nora Barry Fischer |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |
| | ) |

## MEMORANDUM OPINION

## I.     INTRODUCTION

Deborah Metz ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 1318-1383 (the "Act"). This matter comes before the Court on cross-motions for summary judgment filed by the parties pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Docket Nos. 8-10). The record has been developed at the administrative level. For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence. Therefore, Plaintiff's Motion for Summary Judgment (Docket No. 8) is GRANTED, Defendant's Motion for Summary Judgment (Docket No. 10) is DENIED, and the matter is REMANDED for further consideration by the ALJ.

## II.     PROCEDURAL HISTORY

On January 29, 2007, Plaintiff filed her initial application for SSI and DIB due to depression, anxiety, asthma, and hypertension, alleging an onset date of September 1, 2006. (R at 70).[1] [2] The claims were denied on July 2, 2007 because Plaintiff failed to attend an examination that was scheduled for her. (*Id.*; R. at 72; 77-84). Plaintiff did not file an appeal. (R. at 12). Consequently, the July 2, 2007 decision is a final decision of the Commissioner through that date.

On November 21, 2007, Plaintiff filed a second application for SSI and DIB benefits due to depression, anxiety, panic attacks, bipolarity, asthma, high blood pressure, hypertension, and legal blindness in the left eye, again alleging an onset date of September 1, 2006. (R. at 85; 90).[3] Her claims were denied initially on March 5, 2008. (*Id.*). Her request for a hearing was granted and a hearing was held on August 12, 2009 before ALJ Lamar W. Davis. (R. at 12-22; 95-97). Plaintiff was represented by Steven F. Kessler, Esquire, at said hearing. (R. at 12; 101-02). ALJ Davis issued an unfavorable decision on September 21, 2009. (*Id.*). On January 29, 2010, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's September 21, 2009 decision the final decision of the Commissioner. (R. at 1-3).

---

[1] Citations to Docket Nos. 6 - 6-8, the Record, *hereinafter*, "R. at ___."
[2] On March 3, 2007, Plaintiff was interviewed by a Social Security Administration attendant regarding her prior application for benefits. (R. at 147-150). Her anxiety was so apparent that the interviewer noted in his observations, "She came to the interview with her boyfriend who had to reassure her and calm her down during the interview because she was afraid to be [t]here." (R. at 149). The Development Summary Worksheet in her prior claim also stated that she needed to have her consultative exam rescheduled so that her case manager could accompany her. (R. at 182).

[3] In an interview for Plaintiff's Disability Report conducted by the Social Security Administration Field Office on November 21, 2007, the interviewer noted that Plaintiff "was edgy, rocking back and forth, cooperative, and somewhat short with answers." (R. at 184-189). Plaintiff explained that she was only able to leave her house with someone that she knew and trusted, and consequently, she became dependant on her teenage son. (R. at 195-196). She stated that if either her son or her case manager were not available to go to the doctor's office with her, she would miss the appointment because she could not attend without them. (R. at 197-198; 221). Additionally, Plaintiff stated that due to her dependency on her son, she was contemplating taking him out of school to care for her, against his wishes. (R. at 223).

The instant action was initiated by Plaintiff filing her Complaint in this Court on March 22, 2010, pursuant to 42 U.S.C. § 405(g). (Docket No. 3). Defendant filed his Answer on June 6, 2010. (Docket No. 5). Plaintiff's Motion for Summary Judgment and accompanying Brief were filed on July 7, 2010. (Docket Nos. 8-9). Defendant's Motion for Summary Judgment and accompanying Brief were filed on August 2, 2010. (Docket No. 10). Plaintiff filed her Reply Brief in Support of Motion for Summary Judgment on August 18, 2010. (Docket No. 12).

## III.  STANDARD OF REVIEW

Judicial review of the Commissioner's final decisions on disability claims is provided by statute. 42 U.S.C. §§ 405(g)[4] and 1383(c)(3).[5] Section 405(g) permits a district court to review transcripts and records upon which a determination of the Commissioner is based. Because the standards for eligibility under Title II, 42 U.S.C. §§ 401-433 (regarding DIB), and judicial review thereof are virtually identical to the standards under Title XVI, 42 U.S.C. §§ 1381-1383(f) (regarding SSI), regulations and decisions rendered under the Title II disability standard, 42 U.S.C. § 423, are pertinent and applicable in Title XVI decisions rendered under 42

---

[4] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the Plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[5] Section 1383(c)(3) provides in pertinent part:

> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

U.S.C. § 1381(a). *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3 (1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n. 1 (3d Cir. 2002).

When reviewing a decision denying DIB and SSI, the district court's role is limited to determining whether substantial evidence exists in the record to support the ALJ's findings of fact. *Burns,* 312 F.3d at 118. Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate." *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. A district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh evidence of record. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d. Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion […] so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings."). To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole. *See* 5 U.S.C. §706.

To be eligible for social security benefits under the Act, a claimant must demonstrate that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986).

The ALJ must utilize a five-step sequential analysis when evaluating the disability status of each claimant. 20 C.F.R. §404.1520. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., pt. 404 subpt. P., appx. 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

## IV. STATEMENT OF FACTS

### A. General Background

Plaintiff, born on August 4, 1961, was 45 years old as of her alleged onset date, September 1, 2006, and 48 years old on the date of her hearing before the ALJ, August 12, 2009. (R. at 27). Plaintiff has an 11th grade education with no GED. (*Id.*). Plaintiff was married to Russell Metz on November 9, 1981, and their marriage ended by divorce on October 1, 1990. (R. at 113). Plaintiff is the mother of four children, one of whom has been diagnosed with Marfan syndrome.[6] (R. at 242). Additionally, at the time of the hearing Plaintiff was living with

---

[6] "Marfan syndrome" is "a connective tissue multisystemic disorder characterized by skeletal changes (arachnodactyly, long limbs, joint laxity, pectus), cardiovascular defects (aortic aneurysm which may dissect, mitral

her 17 year-old son. (R. at 28). Around that time, Plaintiff had a live-in boyfriend whom she claimed was abusive toward her. (R. at 242).

Plaintiff had some difficulty maintaining relationships with her family. (R. at 176). Plaintiff's parents are both deceased, as her father died of diabetes and high blood pressure, and her mother's death in 2008 left her grieving for almost a year. (R. at 242; 452). Plaintiff has two sisters, both of whom have been treated for depression, and a brother with a history of heroin addiction. (R. at 242). She also admits to having a history of drug problems, specifically crack cocaine and alcohol abuse. (*Id.*). Additionally, according to Plaintiff, her brother sexually abused her and her sisters when they were children. (*Id.*). He later killed a man in self defense in 2006. (*Id.*).

Her past relevant work[7] includes some work as a cashier and stock person at a pharmacy. (R. at 43). This type of work is considered both light and unskilled, and it is Plaintiff's only employment experience that lasted more than three months. (*Id.*).

**B.    Plaintiff's Medical Background**

In Plaintiff's initial request for benefits, she included claims related to her depression, anxiety, panic attacks, bipolar condition, asthma, high blood pressure, hypertension, and legal blindness in her left eye. (R. at 85). On appeal, Plaintiff only disputes the ALJ's decision with regard to her mental impairments. Thus, the Court will only detail her medical background related to her mental impairments.

1.    *UPMC McKeesport: November 6, 2006 through December 22, 2006*

---

valve prolapse), and ectopia lentis; autosomal dominant inheritance, caused by mutation in the fibrillin-1 gene (FBN1) on chromosome 15q."  Stedman's Medical Dictionary 1904 (28th ed. 2006).
[7] Past relevant work is defined as work that a claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn how to perform the work. 40 C.F.R. § 404.1560(b)(1).

On November 21, 2006, Plaintiff visited her primary treating doctors at UPMC McKeesport Internal Medicine, complaining that she had been depressed for the last several months. (R. at 299). She claimed to have experienced frequent thoughts of committing suicide and informed them that she attempted suicide by taking pills ten years ago. (R. at 299). Plaintiff was escorted to the Emergency Room where she was admitted to the psychiatric floor. (R. at 240; 300). She was diagnosed with Major Depression[8], severe, non-psychotic, and Anxiety Disorder[9], Not Otherwise Specified (NOS). (R. at 243). Additionally, the attending physician noted that Plaintiff might be bipolar.[10] (*Id.*). Further, the toxicology report returned positive for cocaine. (R. at 239). Plaintiff was treated with psychotropic medications, including Klonopin[11], Lamictal[12], and Remeron[13]. (R. at 238). Dr. Carlos Placci observed Plaintiff to be "obviously

---

[8] "Clinical depression," also known as major depression, is "a mental state or chronic mental disorder characterized by feelings of sadness, loneliness, despair, low self-esteem, and self-reproach; accompanying signs include psychomotor retardation (or less frequently agitation), withdrawal from social contact, and vegetative states such as loss of appetite and insomnia." Stedman's Medical Dictionary 515 (28th ed. 2006).

[9] "Anxiety disorder" is "a group of disorders involving various manifestations of anxiety that are grouped together nosologically in the DSM (Diagnostic and Statistical Manual of Mental Disorders). These include: panic disorders, specific phobia, formerly simple phobia, social phobia that was formerly called social anxiety disorder, obsessive-compulsive disorder, posttraumatic stress disorder, acute stress disorder, generalized anxiety disorder, and anxiety disorders secondary to medical conditions or substance-induce or not otherwise specified." Stedman's Medical Dictionary 567 (28th ed. 2006).

[10] "Bipolar disorder" is "an affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes. The DSM (Diagnostic and Statistical Manual of Mental Disorders) specifies the commonly observed patterns of bipolar I and bipolar II disorder and cyclothymia." Stedman's Medical Dictionary 568 (28th ed. 2000).

[11] "Klonopin is in a group of drugs called benzodiazepines. Clonazepam affects chemicals in the brain that may become unbalanced and cause anxiety. Klonopin is used to treat seizure disorders or panic disorder." Drugs.com, Klonopin, *available at:* http://www.drugs.com/klonopin.html (last visited 9/17/10)

[12] "Lamictal is an anti-epileptic medication, also called an anticonvulsant. Lamictal is used alone or in combination with other medications to treat seizures in adults and children who are at least 2 years old. It is also used to delay mood episodes in adults with bipolar disorder." Drugs.com, Lamictal, *available at:* http://www.drugs.com/lamictal.html (last visited 9/17/10)

[13] "Remeron is a tetracyclic antidepressant. It affects chemicals in the brain that may become unbalanced and cause depression. It is thought to increase the activity of norepinephrine and serotonin which help elevate mood. Remeron is used to treat major depressive disorder." Drugs.com, Remeron, *available at:* http://www.drugs.com/remeron.html (last visited 9/17/10)

depressed" and noted that she cried easily and appeared tense. (R. at 242). Additionally, he found that Plaintiff's intelligence was within a normal range and her language was understandable, with some pressured speech, but her articulation was not very good. (*Id.*). By November 26, 2006, Plaintiff told Dr. Placci she felt better, and he assigned her a global assessment of functioning ("GAF") score of 60.[14] (R. at 238). On November 28, 2006, Plaintiff was discharged with instructions to follow up on an outpatient basis. (*Id.*).

On December 15, 2006, Plaintiff visited Dr. Ghobrial at UPMC McKeesport for shortness of breath. (R. at 295). In his report, Dr. Ghobrial stated that Plaintiff's anxiety and depression continued despite the use of psychotropic medication, and he instructed Plaintiff to continue taking Piroxicam[15] and Remeron for anxiety and depression. (*Id.*).

On December 22, 2006, Plaintiff attended a follow-up visit with Dr. Ghobrial regarding her shortness of breath. (R. at 291). He found that Plaintiff continued to be anxious and depressed. (*Id.*). Additionally, Plaintiff reported that she often had suicidal thoughts. (*Id.*). Dr. Ghobrial increased Plaintiff's dosage of her psychotropic medications. (R. at 292).

2. *Mon-Yough Community Services Adult Mental Health*

---

[14] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." A GAF score of between 31-40 denotes "severe symptoms" with some impairment in reality testing or major impairments in several areas. American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation ....)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., ... suicidal preoccupation)" or "inability to function in almost all areas ...; of 20 "[s]ome danger of hurting self or others ... or occasionally fails to maintain minimal personal hygiene ... or gross impairment in communication...." *Id.*

[15] Piroxicam or "Feldene [is] a nonsteroidal anti-inflammatory drug, used to relieve the inflammation, swelling, stiffness, and joint pain associated with rheumatoid arthritis and osteoarthritis (the most common form of arthritis). It is prescribed both for sudden flare-ups and for long-term treatment." Drugs.com, Piroxicam, *available at:* http://www.drugs.com/pdr/piroxicam.html#ixzz0uz5IMpix (last visited 9/17/10)

On December 15, 2006, Plaintiff began treatment with Mon-Yough Community Services Adult Mental Health ("Mon-Yough"), where she underwent a diagnostic evaluation with Dr. Omar Bhutta. (R. at 250). His report stated that despite taking Luvox[16] and Remeron, Plaintiff was still quite anxious and crying for no reason. (*Id.*). Dr. Bhutta diagnosed her with Major Depression, Recurrent and Severe and assigned her a GAF score of 50. (R. at 251).

Thereafter, Plaintiff attended regular treatment with several psychiatrists at Mon-Yough and attended group therapy three days a week for approximately 2-3 hours per day. (R. at 178). On February 2, 2007, Dr. Bhutta noted that Plaintiff appeared "very nervous" and that her impulse control was fragile. (R. at 249). He assigned her a GAF score of 50. (*Id.*). On February 9, 2007, Dr. Wayne noted that Plaintiff continued to appear very anxious and nervous and diagnosed her with Major Depressive Disorder, Recurrent and a Personality Disorder. (R. at 314-315). Additionally, he assigned a GAF score of 49. (R. at 315). On March 27, 2007, Plaintiff again met with Dr. Wayne, who noted that Plaintiff described a history of bipolar disorder with a two-year history of constant depression, racing thoughts, a desire for a spending spree, and anxiety. (*Id.*). He reported her GAF score of 35 and started her on Lithium[17] and Wellbutrin[18].

---

[16] Luvox or "[f]luvoxamine is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRIs). Fluvoxamine affects chemicals in the brain that may become unbalanced and cause obsessive-compulsive symptoms. Fluvoxamine is used to treat social anxiety disorder (social phobia), or obsessive-compulsive disorders involving recurring thoughts or actions. Drugs.com, Luvox, *available at:* http://www.drugs.com/mtm/luvox.html (last visited 9/17/10)

[17] "Lithium affects the flow of sodium through nerve and muscle cells in the body. Sodium affects excitation or mania. Lithium is used to treat the manic episodes of manic depression. Manic symptoms include hyperactivity, rushed speech, poor judgment, reduced need for sleep, aggression, and anger. It also helps to prevent or lessen the intensity of manic episodes." Drugs.com, Lithium, *available at*: http://www.drugs.com/lithium.html (last visited 9/17/10)

[18] "Wellbutrin is an antidepressant medication. It works in the brain to treat depression. Wellbutrin is used to treat major depressive disorder and seasonal affective disorder. At least one brand of bupropion (Zyban) is used to help people stop smoking by reducing cravings and other withdrawal effects." Drugs.com, Wellbutrin, *available at:* http://www.drugs.com/wellbutrin.html (last visited 9/17/10)

(R. at 313). However, under the Mental Status Examination section of his report, Dr. Wayne reported Plaintiff to be within normal limits in the following areas: Appearance, Orientation, Impulse Control, Speech, Judgment/Insight, Thought Process, Thought Content, and Sui/Homicidal Idea/Plan. (R. at 312).

On an April 6, 2007 visit, Dr. Wayne noted that Plaintiff was anxious, trembling, and hyperventilating. (R. at 310). By May of 2007, Dr. Wayne noticed that Plaintiff had symptoms of Attention Deficit Disorder, was irritable, and had scattered thought content with focusing problems. (R. at 306). On a May 22, 2007 visit, Dr. Wayne reported Plaintiff was anxious and having panic attacks. (R. at 399). He assigned her a new GAF of 48. (R. at 400). During additional visits in 2007, Dr. Wayne documented that Plaintiff was anxious and stressed, not sleeping, irritable, emotionally unstable, and moody. Her GAF score was repeatedly assigned at 50. (R. at 389-394).

During several visits in 2008, Dr. Wayne noted that no change occurred in Plaintiff's condition, but he continued to increase her medications. (R. at 547; 549; 551). He also stated that Plaintiff was experiencing increasing depression symptoms. (*Id.*).

On February 12, 2009, Dr. Wayne observed an increase in Plaintiff's irritability, mood swings and anxiety after she ceased taking her medications for one week. (R. at 542). He continued to assign her a GAF score of 50, finding no change in her condition. (R. at 543).

Two months later, during an April 7, 2009 visit, Dr. Wayne found Plaintiff's affect, mood, appearance, orientation, impulse control, speech, judgment/insight, thought process and content, and suicidal or homicidal intent or plan to all be within normal limits. (R. at 540).

However, he still maintained her diagnoses of Bipolar I Disorder, most recent episode mixed[19], and moderate Panic Disorder without agoraphobia. (*Id.*). He also assigned her a GAF score of 50 on this visit. (*Id.*).

       3.     *UPMC McKeesport: May 31, 2007 through June 5, 2007*

On May 31, 2007, Plaintiff was admitted to the psychiatric unit at UPMC McKeesport with homicidal/suicidal ideation. (R. at 338). She underwent a psychiatric, medical, and psychosocial evaluation, during which her doctors reviewed her medications and made some changes. (R. at 336). At this time, Dr. Placci assigned her a GAF score of 25. (R. at 339). Plaintiff complained of not sleeping well, being angry, and having an impulse to hit people. (R. at 336). By June 2, 2007, she was sleeping over 7 hours and claimed to be feeling "okay," but Dr. Placci observed that Plaintiff was guarded and evasive. (*Id.*). Plaintiff reported feeling easily agitated and angry. (*Id.*). On June 3, 2007, Dr. Placci noted that Plaintiff was reclusive and depressed but also polite and compliant. (*Id.*). Plaintiff tended to spend time alone in her room, but she denied any type of suicidal ideation and exhibited no psychotic thinking. (*Id.*). By June 4, 2007, her condition improved slightly; however, Plaintiff had a problem with her roommate. (R. at 337). She made statements such as, "This girl bothers me," and she expressed a desire to hit or hurt the roommate. (*Id.*).

On June 4, 2007, Dr. Placci observed that Plaintiff was in acceptable controls, denied suicidal thoughts, did not have any hallucinations and was sleeping well. (*Id.*). Plaintiff was released on June 5, 2007 after Dr. Placci assigned her a GAF score of 60. (R. at 336).

       4.     *Psychiatric Review: January 9, 2008*

---

[19] Bipolar I Disorder is "an affective disorder characterized by the occurrence of alternating (e.g., mixed, manic, and major depressive) episodes. A DSM (Diagnostic and Statistical Manual of Mental Disorders) diagnosis is established when the specified criteria are met." Stedman's Medical Dictionary 568 (28th ed. 2006).

On January 9, 2008, psychiatrist Dr. Jan P. Melcher examined Plaintiff's file, performed a Psychiatric Review, and conducted a Mental Residual Functional Capacity Assessment Technique of Plaintiff. (R. at 413-426). Dr. Melcher diagnosed Plaintiff with Major Depressive Disorder Recurrent Severe, Bipolar Disorder, Anxiety Disorder NOS, Panic Disorder, and Personality Disorder NOS. (R. at 419; 421; 423). Additionally, she determined that Plaintiff had no limitations in the following categories:

- Remembering location and work-like procedures,
- Understanding and remembering very short and simple directions,
- Carrying out very short and simple instructions,
- Performing activities within a schedule, maintaining regular attendance,
- Being punctual within customary tolerances,
- Sustaining an ordinary routine without supervision, and making simple work-related decisions
- Asking simple questions or requesting assistance,
- Being aware of normal hazards or taking appropriate precautions,,
- Traveling in unfamiliar places or using public transportation, and
- Setting realistic goals or making plans independently of others.

(R. at 413-414).

She found Plaintiff to only have moderate limitations in the following areas:

- Understanding and remembering detailed instructions,
- Carrying out detailed instructions,
- Maintaining attention and concentration for extended periods,
- Working in coordination with or proximity to others without being distracted by them,
- Completing a normal workday and workweek without interruptions from symptoms,
- Interacting with the general public,
- Accepting instructions and criticism from supervisors,
- Getting along with coworkers and peers,
- Maintaining socially appropriate behavior and adhering to grooming requirements, and
- Responding appropriately to changes in the work setting.

(R. at 413-414).

According to Dr. Melcher, Plaintiff's basic memory processes were intact, and she could perform simple, routine, repetitive work in a stable environment. (R. at 415). She could make

simple decisions, ask simple questions, accept instruction, and carry out very short and simple instructions. (*Id.*). She was self-sufficient and could sustain an ordinary routine without special supervision. (*Id.*). However, stress exacerbated her symptoms, and she had difficulty working with or near other employees without being distracted by them. (*Id.*). Dr. Melcher found that Plaintiff's statements were partially credible and Plaintiff could meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment. (*Id.*).

     5.     *UPMC McKeesport: January 16, 2008*

On January 16, 2008, Plaintiff visited UPMC McKeesport with a migraine headache, for which Dr. Rani Kumar ordered a CT scan and spinal tap. (R. at 527). Plaintiff stated that she had a severe headache on the left side of her head, purportedly the third migraine she had experienced in the previous eight months. (*Id.*). During this evaluation, Dr. Kumar also assessed Plaintiff's psychiatric state as normal. (R. at 528).

     6.     *Consultative Examination Report*

On February 22, 2008, Dr. Sean H. Choi completed a consultative examination of Plaintiff's physical conditions, in which he noted that Plaintiff had used alcohol frequently since she was twelve years old. (R. at 431). Since Plaintiff stopped drinking, allegedly in July 2006, she began having emotional problems, including nervousness and depression. (*Id.*). She started using cocaine in June 2006, which she used for about a month. (*Id.*). Despite her current medications, Plaintiff still had frequent suicidal ideations and attempts. (*Id.*). Plaintiff's previous suicide attempts included trying to cut her arm several times and nearly jumping in front of a bus. (*Id.*). Dr. Choi observed that Plaintiff spent much of her time crying, did not associate with

friends, and had difficulty concentrating. (R. at 432). He diagnosed Plaintiff with Mental Depression, Severe. (R. at 433).

7.    *Jefferson Regional Medical Center: January 20, 2009 through January 30, 2009*

On January 20, 2009, Plaintiff visited the emergency room at UPMC McKeesport for symptoms of depression and suicidal thoughts. (R. at 498). She stated that she had been depressed for many months, her condition was worsening, and her medications were not helping. (*Id.*). She also had a decreased appetite. (*Id.*) Since no beds were available at UPMC McKeesport, she was transferred to Jefferson Regional Medical Center, where she was later admitted. (R. at 500). Efforts made to stabilize Plaintiff at Jefferson, including treatments with Geodon[20], Ambien[21], Paxil[22], and Xanax, were successful, and she improved. (*Id.*). On January 30, 2009, her doctors felt that Plaintiff had reached the maximum benefits of hospitalization and discharged her. (*Id.*)

8.    *Medical Source Statement: July 22, 2009*

---

[20] "Geodon is an antipsychotic medication. It works by changing the effects of chemicals in the brain. Geodon is used to treat schizophrenia and the manic symptoms of bipolar disorder (manic depression) in adults and children who are at least 10 years old." Drugs.com, Geodon, *available at*: http://drugs.com/geodon.html (last visited 9/17/10)

[21] "Ambien is a sedative, also called a hypnotic. It affects chemicals in your brain that may become unbalanced and cause sleep problems (insomnia). Ambien is used for the short-term treatment of insomnia (difficulty falling or staying asleep). This medication causes relaxation to help you fall asleep." Drugs.com, Ambien, *available at:* http://www.drugs.com/ambien.html (last visited 9/17/10)

[22] "Paxil is an antidepressant in a group of drugs called selective serotonin reuptake inhibitors (SSRI). It works by restoring the balance of serotonin, a natural substance in the brain, which helps to improve certain mood problems. Paxil is used to treat depression, obsessive-compulsive disorder, anxiety disorders, post-traumatic stress disorder, and premenstrual dysphoric disorder." Drugs.com, Paxil, *available at:* http://www.drugs.com/paxil.html (last visited 9/17/10)

On July 22, 2009, after approximately two years of treatment, Dr. Wayne completed a Medical Source Statement detailing Plaintiff's mental conditions and symptoms. (R. at 612-614). Dr. Wayne diagnosed Plaintiff with Bipolar I Disorder, most recent episode mixed, and Panic Disorder with Agoraphobia.[23] (R. at 612). Dr. Wayne characterized her symptoms as persistent, causing Plaintiff to lose interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, difficulty concentrating or thinking, thoughts of suicide, hallucinations, delusions, or paranoid thinking. (*Id.*). According to Dr. Wayne, Plaintiff suffered from some or all of the following intermittently: hyperactivity, pressure of speech, flight of ideas, inflated self-esteem, decreased need for sleep, involvement in activities with a high probability of painful consequences which are not recognized, or hallucinations, delusions, or paranoid thinking; however, he specifically noted Plaintiff's easy distractibility. His report also stated that Plaintiff suffered from panic attacks that resulted in the complete inability to function outside the area of her home. (*Id.*). While Plaintiff did not suffer from significant obsessive compulsive symptoms, Dr. Wayne wrote that she did have recurrent and intrusive recollections of traumatic experiences, which was a source of marked distress. (*Id.*). According to him, concentration deficiencies and repeated episodes of deterioration or decompensation in work caused Plaintiff to withdraw from the situation or experience exacerbation of her symptoms. (R. at 613).

Dr. Wayne reported that Plaintiff had extreme limitations in the following areas:

- The ability to maintain social functioning (R. at 612).
- The ability to maintain attention and concentration for extended periods (R. at 613).
- The ability to work in coordination with and proximity with others without being distracted by them (*Id.*).

---

[23] Agoraphobia is "[a] mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or avoided; often associated with panic attacks." Stedman's Medical Dictionary 40 (28th ed. 2006).

- The ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (*Id.*).
- The ability to interact appropriately with the general public (*Id.*).

Dr. Wayne reported that Plaintiff had marked limitations in the following areas:

- The ability to maintain activities of daily living (R. at 612).
- The ability to understand and remember detailed instructions (R. at 613).
- The ability to sustain an ordinary routine without special supervision (*Id.*).
- The ability to ask simple questions or request assistance (*Id.*).

Dr. Wayne reported that Plaintiff had moderate limitations in the following areas:

- The ability to remember locations and work-like procedures (R. at 613).
- The ability to understand and remember short and simple instructions (*Id.*).
- The ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances (*Id.*).
- The ability to make simple, work-related decisions (*Id.*).

Dr. Wayne did not find that Plaintiff was "not significantly impaired" in any category. (R. at 612-13).

9. *Administrative Hearing: August 12, 2009*

A hearing regarding Plaintiff's application for SSI and DIB benefits was held on August 12, 2009, in Pittsburgh, Pennsylvania before ALJ Lamar W. Davis. (R. at 23). At said hearing, Plaintiff appeared with the assistance of counsel, Steven F. Kessler, Esquire. (R. at 25). Also appearing to testify were Samuel E. Edelmann[24], an impartial vocational expert, and Megan Kearns, Plaintiff's service coordinator from Mon-Yough Community Services. (*Id.*).

Plaintiff testified regarding her inability to hold a job due to her bipolar disorder and severe depression. (R. at 27). According to Plaintiff, her mood and mental state fluctuate such that she has difficulty forming and maintaining relationships. (*Id.*). Additionally, Plaintiff

---

[24] Mr. Edelmann has a Bachelor of Arts from Ohio University in Political Science and Psychology and a Masters of Education from the University of Pittsburgh in Rehabilitation Counseling. (R. at 105; 106). He has participated in a number of local graduate school practicum and internships, and since 1975, he has been in the private practice of vocational rehabilitation counseling and consultation. (*Id.*). He is an independent and unbiased consultant expert witness to the Office of Disability Adjudication and Review, Social Security Administration. (*Id.*).

testified that she is unable to leave her house by herself due to her agoraphobia. (R. at 31). Plaintiff explained that when she becomes depressed, she also becomes suicidal. (R. at 32). Plaintiff stated that she had previously cut her wrists with razor blades, tried to overdose on pills, and attempted to jump in front of a bus. (R. at 34). Furthermore, Plaintiff explained that when she becomes depressed she is completely unable to function and locks herself in her room for days. (*Id.*).

When asked how she was able to smile and joke with other patients during her January 20, 2010 hospital stay for depression, Plaintiff stated that she was only able to do so because she was medicated. (R. at 34). However, she did not like the heavy medication because she became lethargic. (R. at 35).

Next, ALJ Davis examined Ms. Kearns regarding her experiences with Plaintiff. (R. at 36). Ms. Kearns explained her role as a Service Coordinator at Mon-Yough, and she has been assigned to Plaintiff's case for almost three years. (R. at 37). She met with Plaintiff two to three times a month and has been unable to move her to a lower level of contact because her symptoms have not improved. (*Id.*). Additionally, Ms. Kearns stated that she attends many of Plaintiff's mental health appointments with her because Plaintiff becomes "very panicky" when she has to leave the house by herself. (*Id.*). Ms. Kearns agrees with the assessment of Dr. Wayne and believes Plaintiff's psychological symptoms would prevent her from working an eight hour day. (R. at 38). Regarding Dr. Wayne's November 19, 2008 assessment of Plaintiff, Ms. Kearns explained that the reason Plaintiff's orientation, speech, mood, and thought processes were marked as within normal limits is because when Plaintiff is accompanied to appointments, she has better control over her anxiety symptoms. (R. at 40-42).

Mr. Edelmann testified next. (R. at 43). ALJ Davis asked Mr. Edelmann whether jobs existed for a hypothetical individual with Plaintiff's age, education, and work history who is limited to "[…] light exertional activity. Is precluded from all exposure to hazards, such as unprotected heights and dangerous machinery. All environmental factors that would impact the respiratory system […] and is relegated to simple, routine, repetitive tasks involving no interaction with the general public and no more than incidental interaction with coworkers." (R. at 43). Mr. Edelmann identified several such jobs: hand packager, sorter, or grader. (R. at 44). ALJ Davis then asked if jobs were available for an individual that in addition to the foregoing array of limitation requires "accommodations for inattention and distraction caused by intermittent symptoms, adversely affected decisions and pace, and resulting in a 20 percent downward departure from established standards of work place productivity." (R. at 45). Mr. Edelmann stated that those limitations would preclude her from all work. (*Id.*).

10.     *ALJ's Decision: September 21, 2009*

The ALJ issued his decision on September 21, 2009, concluding that Plaintiff did not meet the requirements for DIB or SSI benefits because she "has not been under a disability within the meaning of the Social Security Act from September 1, 2006 through the date of this decision." (R. at 13).

In his decision, the ALJ made the following determinations: (1) The July 2, 2007 determination addressing the claimant's prior claims for benefits will not be reopened and revised and the doctrine of *res judicata* applies to the issue of disability from September 1, 2006, the claimant's alleged onset date, through July 2, 2007, the date of the final determination (R. at 15); (2) Plaintiff meets the insured status requirements of the Social Security Act through June 30, 2010 (*Id.*); (3) Plaintiff has not engaged in substantial gainful activity since July 3, 2007

(*Id.*); (4) Plaintiff has the following severe impairments: degenerative disc disease of the lumbar spine; osteoarthritis of the knees, bilaterally; asthma; hypertension; migraines; obesity; left eye blindness; bipolar disorder; and anxiety disorder (*Id.*); (5) Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (*Id.*); (6) Plaintiff has the residual functional capacity to perform light work, except she must avoid all exposure to hazards such as unprotected heights and dangerous machinery; avoid temperature extremes of less than 40 degrees and greater than 90 degrees Fahrenheit, humidity greater than 90 percent and all exposures to fumes, dust and airborne particulates; and can only perform jobs requiring peripheral vision, visual acuity or depth perception consistent with unimpeded ambulation indoors about the home; and can perform no more than simple, routine and repetitive tasks involving no interaction with the general public; and can have no more than incidental interaction with co-workers, defining as totaling not more than 1/6 of a routine 8-hour work shift (R. at 16); (7) Plaintiff is unable to perform any past relevant work experience (R. at 21); (8) Plaintiff was classified as a "younger individual" under the Social Security Act (*Id.*); (9) Plaintiff has a high school education and is able to communicate in English (*Id.*); (10) Transferability of job skills is immaterial to the determination of disability (*Id.*); (11) There are jobs that Plaintiff can perform, taking into consideration Plaintiff's age, education, work experience, and residual functional capacity. (*Id.*).

The ALJ held that Plaintiff's medically determinable impairments could be reasonably expected to produce the alleged symptoms. However, he stated, "Plaintiffs statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with […] the residual functional capacity" assessment. (R. at 18). Plaintiff admitted to being able to go shopping, although her sister accompanies her. (R. at

17). She also admitted that she is able to tend to her personal needs independently, lives with her 17-year-old son, is able to fix dinner, and continues to smoke despite her asthma. (*Id.*). Also, Plaintiff admitted to laughing and talking with her peers in the hallway of the hospital on her January 2009 visit, while otherwise acting very depressed when visited by heath care professionals, because she was "medicated." (*Id.*). Relying primarily on the opinions of Dr. Jan Melcher, a file examiner, the ALJ found that Plaintiff had no worse than moderate limitation in any area of mental health functioning. (R. at 21). As a result, he concluded that Plaintiff was not disabled under the Social Security Act and, thus, denied her disability benefits. (R. at 22).

## V. DISCUSSION

In her Motion for Summary Judgment, Plaintiff asserts two arguments. (Docket Nos. 8-9). Plaintiff first contends that the ALJ erred by improperly discrediting the evaluation of Plaintiff's treating physician, Dr. Wayne. (Docket No. 9 at 10). Plaintiff secondly argues that the ALJ erred by failing to consider any of the GAF scores assessed to Plaintiff. (Docket No. 9 at 12). Taken together, Plaintiff alleges that the ALJ's opinion is not supported by substantial evidence. In his Motion for Summary Judgment, Defendant maintains that the ALJ's findings and determination are supported by substantial evidence. (Docket Nos. 10-11). The Court will address each of these arguments, in turn.

### A. Evaluation of Dr. Wayne's Opinion

Plaintiff first argues that the ALJ failed to give controlling weight to the opinion of her treating physician, Dr. Wayne. (Docket No. 9 at 10). Dr. Wayne diagnosed Plaintiff with Bipolar Disorder, Major Depressive Disorder, and Panic Disorder throughout the course of his treatment of her from 2007 to 2009 and found that she had marked and extreme limitations which would preclude her from working in July 2009. (R. at 314-315; 540). Plaintiff claims that

the ALJ did not provide adequate reasons for rejecting Dr. Wayne's opinions in favor of those of Dr. Melcher's, a non-treating state psychologist.  (Docket No. 9 at 12).  In 2008, Dr. Melcher found that Plaintiff could meet the basic demands of competitive work.  (R. at 415).  Plaintiff also alleges that the ALJ substituted his own lay opinions of the Plaintiff's mental conditions for those of Plaintiff's treating physician's Dr. Wayne.  (Docket No. 9 at 12).

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).  More weight should be given to the opinions of a claimant's treating physician because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)).  The Court of Appeals has "consistently held that it is improper for an ALJ to credit the testimony of a consulting physician who has not examined the claimant when such testimony conflicts with testimony of the claimant's treating physician." *Brownawell*, 554 F.3d at 357.

When rejecting a treating physician's findings or according such findings less weight, an ALJ must be as "comprehensive and analytical as feasible" and provide the factual foundation for the decision and specific findings that were rejected.  *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).  Such an explanation is not required to match the rigor of "medical or scientific analysis," since the ALJ is a "non-scientist."  *Id.*  But while the Court of Appeals has held that an ALJ may consider laboratory and clinical findings regarding a treating source's opinion, the Court also has held that the ALJ "must give some indication of the evidence he rejects and the

reason for discounting it." *Fargnoli*, 247 F.3d at 43. An ALJ "cannot reject evidence for no reason or for the wrong reason," *Morales*, 225 F.3d at 317 (quoting *Plummer*, 186 F.3d at 429), and must make enough factual findings so that the reviewing court has the ability to determine if "significant probative evidence was not credited or simply ignored." *Fargnoli*, 247 F.3d at 42.

Plaintiff first alleges that the ALJ rejected Dr. Wayne's opinions in favor of Dr. Melcher's assessments without providing adequate reasoning for doing so. (Docket No. 9 at 12). The Court agrees with this assessment. Dr. Melcher evaluated Plaintiff's case in January of 2008; thus, she based her opinions only on the records available prior to that date and found that Plaintiff was capable of obtaining and maintaining employment. (R. at 413-426).[25] Therefore, Dr. Melcher did not consider any of Plaintiff's subsequent medical records in 2008 or 2009. (*Id.*).

In contrast, Dr. Wayne treated Plaintiff both before and during this time period. (R. at 310; 300; 547; 542; 540). His diagnoses remained fairly consistent throughout, noting severe depression, bipolar disorder, and panic disorder, and he assessed GAF scores around 50, indicating serious symptoms. (*Id.*). As discussed in further detail below, Dr. Wayne also treated Plaintiff in January of 2009, when she admitted herself to inpatient psychiatric treatment for a third time in 27 months. (R. at 299; 338; 498; 459-488). He later conducted follow-up outpatient evaluations of her and largely continued with his earlier diagnoses. (R. at 612-614).

---

[25] In his argument, Defendant relies on decisions from the Court of Appeals in support of his position that the portions of Dr. Wayne's opinion based on Plaintiff's subjective statements are not probative or significant. *See Hatton v. Commissioner*, 131 Fed. Appx. 877, 879 (3d Cir. 2005) (holding that an ALJ was not required to adopt subjective limitations claimant repeated but physician did not observe during a clinical examination); *Morris v. Barnhart*, 78 Fed. Appx. 820, 824-25 (3d Cir. 2003)(finding that "mere memorialization of a claimant's subjective statements in a medical report does not elevate the statements to a medical opinion"). The Court is not persuaded by this argument in this case and finds that a remand is necessary for the reasons discussed herein.

The Social Security Administration has advised that opinions from state medical or psychological consultants may be entitled to greater weight than treating sources in appropriate circumstances, such as when the state psychological consultant bases her review on "a complete case record that includes a medical report from a specialist in the individual's impairment which provides more detailed and comprehensive information than what was available to the individual's treating source." SSR 96-6p.

The opposite is true here, as Dr. Melcher had less information available to her than the treating physician did, and thus she did not base her review on the complete case record. Therefore, it was error for the ALJ to give greater weight to Dr. Melcher's findings of moderate limitations over Dr. Wayne's findings of marked to extreme limitations without further explanation. (R. at 20-21).

In this instance, the ALJ also erroneously relied on a number of factual distortions or inaccuracies in rejecting Dr. Wayne's opinions. For example, the ALJ only briefly described Plaintiff's 2007 mental health records. (R. at 20). The ALJ cited Exhibit No. 12F and found that "treatment records form [sic] Mon-Yough during the relevant time period in 2007 show some occasional labile/moody affect and mood, with some fragile impulse control, but otherwise regularly indicate normal orientation, speech, judgment/insight, thought process, thought contact and affect, with no suicidal or homicidal thought." (*Id.*). While Exhibit No. 12F shows that Dr. Bhutta assigned Plaintiff the previous qualities within normal limits, it also shows that he found her to be very anxious, stressed, and not sleeping, and he diagnosed her with Major Depression and Panic Disorder, assigning her a GAF score of 50. (R. at 391-392). As he apparently only considered the 2007 Mon-Yough records, the ALJ disregarded Plaintiff's six day inpatient hospitalization at UPMC McKeesport for depression and homicidal/suicidal ideation in late May,

early June of 2007. (R. at 338-339). On admission at UPMC McKeesport, Dr. Placci assigned Plaintiff a GAF score of 25. (*Id.*). After six days of treatment and medication, Plaintiff was released, at which point Dr. Placci diagnosed her with major depression and assigned her a GAF score of 60. (R. at 336). Given these omissions, the Court cannot meaningfully review the ALJ's consideration of the 2007 evidence.

Similarly, the ALJ rejected Dr. Wayne's July 2009 opinions because they were not supported by his treatment records in 2009. (R. at 20). However, the ALJ focused on visits in February and April and failed to acknowledge the fact that Dr. Wayne treated Plaintiff during her inpatient visit at Jefferson Regional in January 2009. (R. at 446-447; 451; 459-488). Therefore, it was error to discredit Dr. Wayne's opinions for lacking support in objective medical records without fully considering all of his treatment notes, including those from his evaluation of Plaintiff at Jefferson. To this end, the ALJ also discredited the testimony of Plaintiff's social worker, Megan Kearns, apparently disbelieving that Kearns "told Dr. Wayne about the specifics of the claimant's decompensation episodes." (R. at 18). This was clear error, given Dr. Wayne's treatment of Plaintiff during the inpatient hospitalization, an episode of decompensation of which he was certainly aware.

The ALJ also incorrectly discounts the severity of Plaintiff's symptoms during her January 2009 hospitalization. The ALJ found that "the claimant's mental status was deemed clear and her orientation normal, with no noted psychiatric problems, upon examination at UPMC in January 2009." (R. at 20). However, the cited record, 18F, p. 7, does not support this finding. (R. at 498). Instead, the record reflects that Plaintiff arrived at UPMC McKeesport crying, complaining of depression and suicidal thoughts. (*Id.*). Plaintiff was then referred for a

psychiatric exam and attempted to be admitted to the psychiatric hospital. However, no beds were available and she was transferred to Jefferson. (R. at 499).

In addition, it was error for the ALJ to disregard the records of this inpatient hospitalization in favor of observations that while she was hospitalized and on medication, Plaintiff was playing Bingo and interacting loudly with other patients. (R. at 20). Moreover, these observations occurred on January 23 and 25, 2009, respectively, three to five days after Plaintiff was admitted to Jefferson and had received treatment. (R. at 467; 468; 474; 482). It was likewise error for the ALJ to disregard favorable evidence in Dr. Wayne's notes, opinions, and GAF scores he assigned to Plaintiff and instead rely on a handful of statements during their patient-physician relationship where Dr. Wayne assessed Plaintiff's behavior as within normal limits, or "WNL". (*Id.*). The Court of Appeals has held that a physician's occasional "notation that a condition is 'stable and well controlled with medication' during treatment does not necessarily support the conclusion that the patient is able to work." *Morales v. Apfel*, 225 F.3d at 319; *see also Brownawell*, 559 F.3d at 357 (noting the same). These types of discrepancies do not per se create an inconsistent medical record. *Morales*, 225 F.3d at 319.

Finally, Plaintiff claims the ALJ erroneously substituted his own lay opinion in favor of Dr. Wayne's expert medical opinions. "The principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability." *Id.* Similarly, "an ALJ's personal observations of the claimant 'carry little weight in cases […] involving medically substantiated psychiatric disability.'" *Id.* (quoting *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984)). The ALJ's decision is questionable in this regard because he rejected Dr. Wayne's opinion with little supporting medical evidence. Given the lack of explanation of the pertinent medical records, it appears that the ALJ simply replaced Dr.

Wayne's opinion with his own opinion without sufficiently elaborating why Dr. Wayne's records do not support the existence of these symptoms. (R. at 18).

In this Court's estimation, the ALJ erred in his consideration of Dr. Wayne's opinions, failed to provide a sufficient explanation or evidentiary support for giving diminished weight to his opinions, and should not have substituted his own lay opinions for Dr. Wayne's opinions. For these reasons, the ALJ's findings and opinions are not supported by substantial evidence.

### B. Assessment of GAF Scores

Plaintiff next contends that the ALJ did not properly consider and discuss the GAF scores assigned to Plaintiff. Plaintiff alleges that the ALJ erred in failing to give any consideration to GAF scores ranging from 25 to 50 that Plaintiff received over the course of various psychological evaluations. (Docket No. 9 at 14). Defendant disagrees and argues that the ALJ did not err despite his failure to cite to any of the GAF scores.

Plaintiff relies on *Wiggers v. Astrue* and a number of other decisions for the proposition that it is reversible error for an ALJ to fail to discuss GAF scores. *Wiggers v. Astrue*, 2010 U.S. Dist. LEXIS 45964, *24 (W.D. Pa. May 10, 2010). In *Wiggers*, the Court found that an ALJ's failure to address GAF scores ranging from 35 to 40 was improper. *Id.* In so holding, the Court recognized that while a claimant's GAF score does not have a direct correlation to severity requirements, the GAF is the scale used by mental health professionals to provide a prognosis, and therefore, GAF scores constitute acceptable medical evidence that must be addressed by an ALJ in making a determination regarding a claimant's disability. *See id.* at *24-*25. (citing *Watson v. Astrue*, 2009 U.S. Dist. LEXIS 91268 (E.D. Pa. 2009)). In opposition, Defendant relies on *Gilroy v. Astrue* for the proposition that an ALJ need not expressly discuss GAF scores or exhaustively discuss every piece of evidence in the record. *See Gilroy v. Astrue*, 351

Fed.Appx. 714, 715 (3d Cir. 2009). In *Gilroy*, the Court of Appeals held that a single GAF score of 45 or 50 is not conclusive evidence of a mental disability. *Id.* In this Court's estimation, *Gilroy* is distinguishable and *Wiggers* is more persuasive, given the fact that the ALJ in this case made no mention of any of the GAF scores in the record, despite the presence of numerous scores showing severe symptoms.

Thus, a GAF score is evidence that must be considered by an ALJ. However, a GAF score may be disregarded or accorded little weight depending upon its consistency with the claimant's record as a whole, similar to other record evidence. Where a GAF score is inconsistent or unsupported by a physician's other findings or might be an inaccurate indication of present mental impairment due to inconsistency with whole record, the ALJ is justified in rejecting the GAF score. *Torres v. Barnhart*, 139 Fed. Appx. 411, 415 (3d Cir. 2005). However, in this instance, the ALJ did not mention any GAF scores at all and provided no rationale for rejection of this evidence. Throughout his opinion, the ALJ noted Dr. Wayne's findings that Plaintiff was within normal limits in certain areas. However, on each occasion, he disregarded the corresponding GAF score assessed by Dr. Wayne. He reasoned similarly regarding the notes from other physicians. The ALJ must provide "not only an expression of the evidence s/he considered which supports the result, but also some indication of the evidence which was rejected." *Cotter*, 642 F.2d at 705. Otherwise, this Court cannot determine if evidence such as the GAF scores was not credited or simply ignored. (*Id.*).

In this Court's estimation, these scores are evidence that should be considered by an ALJ in making his evaluation. Since the ALJ apparently rejected the range of GAF scores without providing any reasoning or support behind his action, the decision is not supported by substantial

evidence.   For this and the other reasons outlined above, the matter must be remanded for further consideration.

**VI.      CONCLUSION**

Based upon the foregoing, Plaintiff's Motion for Summary Judgment (Docket No. 8) is GRANTED, Defendant's Motion for Summary Judgment (Docket No. 10) is DENIED, and the matter is REMANDED for further consideration by the ALJ.  An appropriate Order follows.


_s/Nora Barry Fischer_
Nora Barry Fischer
United States District Judge


Date:   September 17, 2010

cc/ecf:  All counsel of record